# KAPLAN HECKER & FINK LLP

350 Fifth Avenue
Suite 7110
New York, NY 10118
(212) 763-0883
www.kaplanhecker.com

Direct Dial: **(617) 417-2334**
Direct Email: bwhite@kaplanhecker.com

August 20, 2020

**By CM/ECF**

The Honorable Valerie E. Caproni
United States District Court
for the Southern District of New York
40 Foley Square
New York, NY 10007

*United States v. Sekhou Toure*, No. 19-cr-808 (VEC)

**Sekhou Toure's Sentencing Submission**

Dear Judge Caproni:

We write on behalf of our client, Sekhou Toure, who is scheduled to be sentenced before Your Honor on September 3, 2020. Over a period of several months in 2018, Mr. Toure allowed the perpetrators of a long-running, broad, and complex criminal scheme to use his personal bank accounts as conduits for stolen checks in violation of 18 U.S.C. § 1344. It was a scheme that was hatched years before Mr. Toure became involved and which continued for nearly another year after he ceased participating and from which Mr. Toure ultimately benefitted to the tune of a few thousand dollars. Nonetheless, Mr. Toure deeply regrets his actions. Notably, Mr. Toure ceased involvement in the scheme well before he knew he was under investigation, and accepted responsibility by pleading guilty on May 6, 2020, being the first and still only defendant in this multi-defendant case to accept responsibility for his actions.

Mr. Toure's plea agreement with the government ("Plea Agreement") includes a stipulated advisory Sentencing Guidelines range of 18 to 24 months' imprisonment. The Probation Department's Presentence Investigation Report ("PSR") recommends a sentence at the bottom of that range of 18 months imprisonment. PSR at p. 24. We respectfully submit, however, that an incarceratory sentence would be greater than necessary to accomplish the aims of sentencing outlined in 18 U.S.C. § 3553.[1] *First*, Mr. Toure's conduct in connection with the check fraud scheme was limited, both in scope and duration. *Second*, Mr. Toure is a hard-working family man who is essentially the lone earner for his wife and four children who live abroad in Senegal, and the overwhelming majority of the few thousand dollars he gained from his participation in this

---

[1] We believe Mr. Toure deserves a non-incarceratory sentence, but recognize that Mr. Toure is not eligible for probation given the nature of the offense of conviction. *See* PSR ¶¶ 103–04. Because the Court can sentence Mr. Toure to "time served," giving him credit for the day he was in custody on the day of his arrest, we refer herein to such a one-day sentence as a "non-incarceratory sentence."

crime went to support his family. *Third*, Mr. Toure's criminal history score presents a misleading picture of his past and significantly overstates the likelihood that he will recidivate. *Finally*, an incarceratory sentence in present circumstances would be especially disruptive and impose an undue hardship in light of the COVID-19 pandemic. These considerations, described in more detail below, counsel in favor of a non-incarceratory sentence (such as, perhaps, a sentence of home confinement), which could be coupled with a relatively lengthy period of supervised release. *See* U.S.S.G. § 5D1.2(a)(2); 18 U.S.C. § 3583. Such a sentence would be sufficient but not greater than necessary to achieve the aims of punishing, deterring, and rehabilitating Mr. Toure.

## I.    The Guidelines Calculations

We agree with the Guidelines range that is calculated in the PSR. Specifically, we agree that the applicable offense level is 11, that Mr. Toure is in criminal history category IV, and that therefore the recommended sentence under the Guidelines is 18 to 24 months.

## II.    A Non-Incarceratory Sentence is Warranted Under 18 U.S.C. § 3553(a)

### a.  Mr. Toure's Background

#### i.  Early Life

From his early childhood until today, Mr. Toure's life has been characterized by hard work and an undying devotion to providing support for his family. Mr. Toure grew up in significantly impoverished circumstances in Senegal. He was the oldest of five children. Because his father worked primarily out of the country as a taxi driver, Mr. Toure was relied on to support his mother in any way that he could, including by working odd jobs as a car mechanic starting at age 12. But the family struggled. Mr. Toure was often without adequate food or clothing, and he in fact spent most of his childhood barefoot because his family could not afford shoes. Despite these difficult circumstances, Mr. Toure enjoyed school, attending first an Arabic school and then a French school. He developed a love of languages, and can now speak or read eight of them—including his native Wolof as well as French, English, and Spanish, the latter two of which he learned after coming to the United States at the age of 16.

Mr. Toure's move to America was driven by necessity and a dream for a better life for his family. His father had moved to the United States when Mr. Toure was a young teenager, and Mr. Toure's family thought that if Mr. Toure, the family's oldest child, could also go it would help support the struggling family. Mr. Toure's paternal grandmother, who had an active role in Mr. Toure's upbringing and with whom Mr. Toure was especially close, was particularly enamored with the idea that Mr. Toure go to the United States to lead a better life. Although Mr. Toure was reluctant to leave his grandmother and the other members of his family, he made plans to leave so that he could come to this country, work hard, and provide opportunities for his loved ones. Given all that his grandmother had done for him, it was Mr. Toure's dream to earn enough money so that he could someday send his grandmother on a pilgrimage to Mecca.

Mr. Toure's plans to come to the United States were called into doubt, however, when his grandmother unexpectedly passed away just one month before he was set to leave in 1999. Nevertheless, on his family's urging, he stuck to his plan and came to the United States. He lived

with his father in Harlem and was committed to working hard for a better life for himself and his family.  He quickly found work offloading trucks at the warehouse of a furniture business, an industry he has worked in consistently ever since and that has allowed him to regularly send money to his family back in Senegal.  And in 2008, the same year that Mr. Toure became a naturalized citizen, Mr. Toure was able to acquire the funds to send his father on the Mecca pilgrimage that his grandmother was never able to take.  It was one of the proudest and happiest moments of Mr. Toure's life.

## ii.  Family

Mr. Toure is above all else a family man and doting father.  He married his wife, Koundia, in 2011, and the two remain happily married.  The joys of Mr. Toure's life are the four children that he and Koundia have together and that currently live in Senegal with Koundia.  Despite the miles between them and an intense work schedule, Mr. Toure nonetheless manages to remain a constant presence in the life of his wife and his children.  He makes every effort to see them as much as he can, saving up money to travel to Senegal to see them at least once a year.  Further, Mr. Toure calls his family every single morning at 7:30 a.m. ET and they speak for thirty minutes to an hour, which is the highlight of Mr. Toure's day. He is proud to report that he is actively involved on a daily basis in helping successfully raise four thriving children in Senegal.

**Fanta**, twelve years old, is doing great in school.  She misses Mr. Toure immensely, and asks every time they speak: "When are you coming?  When are you coming?"  Following in her father's footsteps, she attends French school in the morning until 2:30 p.m., and then goes to an Arabic school from 4:00-6:00 p.m. (although, as of now, Fanta's French school is unfortunately closed due to the COVID-19 pandemic).  When she arrives home, Fanta helps Koundia cook the family dinner.  Fanta has many friends, and Mr. Toure loves to send them gifts and to bring them with him when he travels back to Senegal.  **Ismail**, eight years old, is an active young child who loves sports.  He is looking forward to Mr. Toure buying him his first bicycle for the upcoming holidays.  Ismail is also in French school every day until 2:30 p.m., and although he is too young for Arabic school, he is currently thriving at his private Arabic lessons.  **Mamadou**, five years old, is a strong-willed child who is unfortunately beset by an unknown illness that comes and goes, causing debilitating headaches.  When it hits, Mamadou is forced to spend a week or even longer in bed.  Despite his ailments, Mamadou has recently begun his schooling.  Finally, **Moctar**, two years old, is just learning how to speak on the phone, and Mr. Toure loves to see him develop.

Mr. Toure continues to follow through on his goal to make as good a life for his family as possible, and he sends them money regularly, just about twice a month. Indeed, despite his relatively modest income, Mr. Toure regularly sends money to his family overseas, totaling about $800 each month, *see* PSR ¶ 95, funds which serve as essentially the sole source of income for Koundia and the children.

In addition to his family in Senegal, Mr. Toure is also very close with his father, who lives near to him in the Bronx, as well as his eight younger half-siblings (his father's children).  In fact, ever since moving to the United States, Mr. Toure has had an extremely close relationship with his father.  Indeed, as discussed above, one of Mr. Toure's highest joys in life was sending his father to Mecca.  Mr. Toure also offers regular financial support (around $600 each month) both to his

father, who is not well off, as well as to a number of his father's children, three of which are college students and one is a police cadet with the New York City Police Department. *See* PSR ¶ 95.

iii.   Work Life

It is Mr. Toure's devotion to his family—and to provide for them as much as he can—that drives Mr. Toure to be such a committed working man. As discussed, Mr. Toure has worked in the furniture industry with little interruption for the past sixteen years and he is now the chief white glove delivery service professional at the Furniture City Superstore in the Bronx. *See* PSR ¶¶ 84–93. His current employer thinks the world of him and sees a long-term and successful future for him at the business, describing Mr. Toure as an "invaluable asset to our team," and noting that "the outlook for his future employment with us is very good, and we very much hope to keep him on our staff for many years to come." Exhibit 1 (attached hereto). In the letter he provided in connection with this submission, Mr. Toure's employer provides further detail as to the type of worker—and person—that Mr. Toure is:

> In good faith, and since he has been employed with us, I have found Sekhou Toure to be an honest and trustworthy person. I have trusted him with our company vehicles, cash on delivery from customers, and merchandise in our warehouse and he has been one of the very few individuals in my staff to possess a store key and open the store every day. I have witnessed tremendous growth in Sekhou over the course of his employment, and [he] has been cooperative, an attentive-team player, and his actions has always inspired and motivated other employees.
>
> It is a genuine honor to write this letter in favor of Sekhou Toure and assure his honest, modest, genuine, trustworthy, and hard-working character.

Exhibit 1.

**b. The HRA Check Fraud Scheme**

The scheme at the center of this action was broad. Its principal perpetrators learned that certain undeliverable checks issued by New York City's Housing Resources Administration ("HRA") made their way to a specific post office box on Church Street in Manhattan. They learned of this in their role as employees for a private courier company that was engaged to pick up these checks from the Church Street post office. Rather than pick up and deliver these checks, however, these individuals—alleged to be Co-Defendants Salifou Conde and Issiaga Sylla—took advantage of the access their job provided to orchestrate a broad scheme to steal the funds connected to those checks. Specifically, they and the network of individuals to whom they dispersed the checks deposited the checks into various bank accounts—certain of which were opened fraudulently and/or accessed with fraudulent debit cards (which at least one co-defendant unlawfully trafficked)—and then withdrew the funds. This scheme took place at least from August 2016 to August 2019 and involved the fraudulent deposit of more than 3,000 HRA checks totaling over $2,700,000 into over 50 bank accounts. *See* PSR ¶ 13; Dkt. No. 86 at 1.

Mr. Toure played virtually no part in much of this broad scheme (and did not plead as such). Mr. Toure had no role in the theft, dispersal, or deposit of HRA checks, nor did he have anything to do with the creation or maintenance of fraudulent bank accounts or trafficking in debit cards. He was not involved in the creation or planning of the scheme and he ceased participation in it long before it ended. He has no connection to any of the 50 alleged bank accounts involved, other than his two personal accounts, which he allowed the perpetrators to use for a matter of months. And the less than $70,000 that flowed through his two accounts (a small fraction of which he actually benefitted from personally, as discussed below) was approximately 2.5% of the money generated by the larger scheme, the rest of which Mr. Toure had no connection to whatsoever. In total, over a brief and discrete stretch in 2018, Mr. Toure allowed fewer than 100 of these HRA checks to be deposited into his personal bank accounts, and over a three-week period Mr. Toure withdrew a few thousand of those dollars in the days before he left on a trip to see his family in Senegal.

### c. A Non-Incarceratory Sentence, Combined with Perhaps Prolonged Supervised Release, Appropriately Reflects Mr. Toure's Culpability and is Sufficient to Deter Future Criminal Activity

A non-incarceratory sentence with a perhaps prolonged term of supervised release is sufficient in light of (i) the circumstances of Mr. Toure's offense; (ii) Mr. Toure's personal circumstances; (iii) the nature of Mr. Toure's criminal history; and (iv) the unique dangers that an incarceratory sentence will impose in light of the COVID-19 pandemic.

*First*, a non-incarceratory sentence combined with supervised release adequately accounts for "the nature and circumstances of [Mr. Toure's] offense." 18 U.S.C. § 3553(a)(1); *see also* 18 U.S.C. § 3553(a)(2)(A). As discussed, Mr. Toure allowed his personal bank accounts to be used by the organizers of a broad criminal scheme as a conduit for checks that they stole from the HRA, a scheme that spanned from August 2016 through August 2019. *See* PSR ¶ 13. For this, there is not a day that passes that Mr. Toure is not regretful.

As the government acknowledges, however, Mr. Toure's role in this sprawling and long-running criminal enterprise was limited, both in scope and duration. *See* Dkt. No. 86 at 4 (the government describing Mr. Toure's role as "relatively contained"); *see also U.S. v. Stewart*, 590 F.3d 93, 140 (2d Cir. 2009) (clarifying that a sentencing court may impose a below-Guidelines sentence under the 18 U.S.C. § 3553(a) sentencing factors where defendant's "conduct was less culpable than that of his co-conspirators"); *see also U.S. v. Esso*, 486 F. App'x 200, 203 (2d Cir. 2012) (vacating sentence and concluding that the district court on remand may assess the relative culpability of a bank fraud defendant as a sentencing factor under 18 U.S.C. § 3553(a)); *U.S. v. Nixon*, 2015 WL 3484492, at *5 (S.D.N.Y. June 2, 2015) (imposing below-Guidelines sentence pursuant to 18 U.S.C. § 3553(a) where the defendant was "a fairly minor player" in the scheme).

By all accounts, Mr. Toure is far less culpable than those who orchestrated and carried out this complex fraud, including his co-defendants. Indeed, both the probation department and the government recognize this expressly. *See* PSR at p. 22; Dkt. No. 86 at 4. For one, Mr. Toure had no role at all in the theft of HRA checks. *See* PSR ¶¶ 14–17; *see also* PSR ¶ 22. And not only is there no evidence that Mr. Toure ever *stole* an HRA check, there is no evidence that he even knew

of their existence.[2]  There is likewise no evidence that Mr. Toure opened his bank accounts using fraudulent identification documents or that he ever used or possessed fraudulent bank information, let alone trafficked in debit cards.  *See* PSR ¶¶ 22, 24; *see also* PSR at p. 23 (noting that "some of the co-defendants reportedly established bank accounts under false names with fraudulent documents"); Dkt. No. 86 at 4.[3]

Rather, the evidence against Mr. Toure shows that his role in the check fraud scheme was essentially limited to allowing, for a period of a several months, the orchestrators of the extant scheme to have the HRA checks that they stole run through Mr. Toure's personal and legitimate bank accounts.  Mr. Toure, on six occasions, withdrew a tiny fraction of those funds.  Specifically, the evidence shows that Mr. Toure allowed during the seven-month period of May 1, 2018 and November 11, 2018 for his personal bank accounts to be used to deposit stolen funds and that, on six occasions over a three-week period (ending just days before he left for a trip to Senegal to see his family), Mr. Toure withdrew modest amounts from one of those accounts.  Mr. Toure had no connection with this scheme in any capacity after December 11, 2018, which was more than 10 months before he (or anyone involved) was arrested.[4]  *See U.S. v. Bannister*, 786 F. Supp. 2d 617, 673–74 (E.D.N.Y. 2011) (imposing below-Guidelines sentence for defendant where his "tenure with the crew . . . was the shortest among the defendants," *id.* at 673, and "his involvement with the conspiracy ceased" a year before he was arrested, *id.*, thus indicating a "brief and low-level involvement in the conspiracy," *id.* at 674); *cf. Gomez v. U.S.*, 2013 WL 1285440, at *3 (S.D.N.Y. Mar. 28, 2013) (discussing imposition of below-Guidelines sentence even though "the Court observed that the defendant would not have ceased his participation in the drug business without the arrest of co-conspirators" because "there was no evidence that the defendant had reentered the drug trade in the years since those arrests").

Not only was Mr. Toure's involvement in this scheme relatively limited, his personal benefit was also *de minimis*.  The amount that Mr. Toure personally received for his role in this scheme is a small fraction—less than 5%—of the $56,079.48 that he is legally responsible for under the Sentencing Guidelines.  The Guidelines attribute that amount of loss to Mr. Toure because that is the amount that flowed through the bank account that other co-conspirators used as a conduit as part of their larger scheme and from which Mr. Toure withdrew.  As the PSI report documents, however, the evidence shows that Mr. Toure only withdrew $2,450 of the deposited HRA funds, and that all of that took place over a three-week period between July 30, 2018 and August 22, 2018 (with five of the six withdrawals taking place over the three-day period of August

---

[2] The government's sentencing submission, filed today, spills significant ink describing the harm caused by the theft of the HRA checks.  Dkt. No. 86.  But to be very clear:  there is not a single shred of evidence that Mr. Toure had any specific knowledge whatever about the provenance of the funds that made their way into his bank accounts.

[3] We note that the Addendum to the PSR states that Mr. Toure "deposited" the HRA checks into his personal bank accounts, PSR at p. 22, but we are aware of no evidence that Mr. Toure ever personally deposited any of the HRA checks; that contention was not included in the draft PSR reviewed by Mr. Toure.  Although we do not see this issue as material to sentencing, we note our objection here.

[4] The last HRA check deposited into Bank Account-1 was deposited on November 11, 2018 and the account had a negative balance as of December 11, 2018.  The last HRA check deposited into Bank Account-2 was deposited on May 31, 2018 and there was no activity in that account after June 4, 2018.

19–22, 2018 and another five taking place at the same ATM).  PSR ¶ 19.  Significantly, he withdrew those funds a matter of days before traveling home to see his family in Senegal.

To be clear, six of the eleven offense level points here are a direct consequence of the Guidelines' loss enhancement calculations.  *See* U.S.S.G. § 2B1.1.  But, as many courts have recognized, the method for calculating and applying the loss enhancement figures under Section 2B1.1 of the Guidelines can create inequitable, unreasonable, disparate, and even irrational sentences that can be disconnected from a defendant's true moral culpability.[5]  That is precisely the case here.  Mr. Toure made the regrettable mistake of allowing others to use his personal bank accounts as a conduit to facilitate a pre-existing and much broader and more sophisticated scheme which Mr. Toure largely knew nothing about and from which he only barely benefited.

*Second*, a non-incarceratory sentence is warranted in light of Mr. Toure's characteristics. *See* 18 U.S.C. § 3553(a)(1).  Mr. Toure is, above all else, a hard-working family man.  Further, as his current employer unequivocally notes, Mr. Toure is trustworthy and would remain employed at the company for the foreseeable future, earning a stable income.  *See* Exhibit 1; *see also* PSR ¶¶ 84–85 & p. 23.  Indeed, Mr. Toure has remained a reliable employee throughout the pendency of this case.  Moreover, Mr. Toure regularly provides much-needed financial—not to mention emotional—support to members of his family, including his four young children who look forward to speaking or seeing Mr. Toure every day at 7:30 a.m., *see* PSR ¶ 95, and thus any period of incarceration will impose an undue hardship on them.  *See U.S. v. Hernandez-Castillo*, 2007 WL 1686686, at *5 (S.D.N.Y. June 7, 2007) ("Considering the history and characteristics of the defendant pursuant to § 3553(a)(1), the Court takes note of the Defendant's difficult childhood, the financial hardships endured by the Defendant and his family, and his continuing, legitimate efforts to help financially support: his family both in the United States and Mexico which presumably contributed to his eventual participation in the instant offense."); *U.S. v. Khalid*, 2011 WL 6967993, at *2 (E.D.N.Y. Dec. 13, 2011) (imposing non-incarceratory sentence for financial crime with Guidelines sentence of 30-37 months in part because "[i]t is unlikely that he will engage in further criminal activity in light of his responsibility for supporting his family in Pakistan").

---

[5] *See U.S. v. Emmenegger*, 329 F. Supp. 2d 416, 427 (S.D.N.Y. 2004) ("The Guidelines place undue weight on the amount of loss involved in the fraud. . . .  [T]he guidelines provisions for theft and fraud place excessive weight on this single factor, attempting—no doubt in an effort to fit the infinite variations on the theme of greed into a limited set of narrow sentencing boxes—to assign precise weights to the theft of different dollar amounts.  In many cases, including this one, the amount stolen is a relatively weak indicator of the moral seriousness of the offense or the need for deterrence. . . .  Nothing about the offense indicates that Emmenegger set out to steal $300,000, no more and no less.  Rather, he took advantage of his position to steal various amounts from time to time."); *see also U.S. v. Corsey*, 723 F.3d 366, 377 (2d Cir. 2013) (Underhill, J., concurring) (describing "loss guideline [as] fundamentally flawed" for this reason);  *U.S. v. Johnson*, 2018 WL 1997975, at *5 (E.D.N.Y. Apr. 27, 2018) ("[T]he Sentencing Commission's loss-enhancement numbers do not result from any reasoned determination of how the punishment can best fit the crime, nor any approximation of the moral seriousness of the crime."); *U.S. v. Gupta*, 904 F. Supp. 2d 349, 351 (S.D.N.Y. 2012) (noting that by "focus[ing] largely on a single factor as the basis for enhanced punishment:  the amount of monetary loss or gain occasioned by the offense . . . the Sentencing Commission effectively ignored the statutory requirement that federal sentencing take many factors into account, *see* 18 U.S.C. § 3553(a), and, by contrast, effectively guaranteed that many such sentences would be irrational on their face"); *see also id.* (observing that focusing on the entire monetary loss, which includes amounts that a defendant "did not share in any direct sense . . . create[s], in the name of promoting uniformity, a sentencing disparity of the most unreasonable kind").

*Third*, a non-incarceratory sentence is appropriate because, under a Guidelines analysis, Mr. Toure is in a relatively high category, category IV, which overstates his criminal record and the likelihood of recidivism. *See* 18 U.S.C. §§ 3553(a)(1), (a)(2)(B); *see also U.S. v. Ingram*, 721 F.3d 35, 37–45 (2d Cir. 2013) (Calabresi, J., concurring) (explaining that post-*Booker*, a court may consider criminal history without formally departing from the Guidelines). Prior to this incident, Mr. Toure's most recent arrest was nearly six years ago, in September 2014, in relation to a dispute with a family friend. *See* PSR ¶¶ 54–56. Four of Mr. Toure's criminal history points relate to separate convictions for attempted forgery and identity theft that both relate to conduct that occurred in 2011, nearly nine years ago and seven years before the conduct at issue here. Further, although required by operation of the Guidelines to treat these instances separately (because Mr. Toure was sentenced on different days), U.S.S.G. § 4A1.2(a)(2), it overstates the nature of Mr. Toure's past to place much weight on the fact that these were truly separate instances. *See* PSR ¶¶ 48–53 Although the probation department (and seemingly the government) were unable to locate any information for those cases, *see* PSR ¶¶ 49, 52; Dkt. No. 86, at 3, those convictions—for which the sentences were imposed concurrently—relate to nearly identical conduct that took place in nearby Orange and Columbia counties three weeks apart in the summer of 2011. *See* Exhibits 2–3 (attached hereto). Specifically, those cases involved the unauthorized use, and the attempted use, of debit cards to make relatively small-scale purchases at upstate retail stores. *See id.*

*Fourth*, an incarceratory sentence for Mr. Toure would be particularly harsh in light of the dangers posed by COVID-19. "[A]s several judges in this district have recognized—'the COVID-19 pandemic presents an extraordinary and unprecedented threat to incarcerated individuals.'" *U.S. v. Torres*, 2020 WL 2815003, at *11 (S.D.N.Y. June 1, 2020) (quoting *U.S. v. Scparta*, 2020 WL 1910481, at *9 (S.D.N.Y. Apr. 20, 2020)); *see also, e.g.*, *U.S. v. Voronjuk*, No. 18-cr-678 (S.D.N.Y. June 30, 2020) (imposing a well-below Guidelines sentence, noting that "under this pandemic condition that we've been facing, the conditions have been extremely difficult," and that "some additional time off is appropriate"). Indeed, in light of the pandemic, "Congress has expressed a . . . desire for courts to 'use all available powers and authorities . . . to reduce the number of federal prisoners . . . in prisons." *U.S. v. Jackson*, 2020 WL 2759601, at *2 (S.D.N.Y. May 26, 2020) (quoting H. Comm. on the Judiciary, Ltr. on DOJ's Handling of Novel Coronavirus (Mar. 19, 2020)); *see also* Timothy Williams et al., *'Jails Are Petri Dishes': Inmates Freed as the Virus Spreads Behind Bars*, N.Y. Times (Mar. 30, 2020), https://www.nytimes.com/2020/03/30/us/coronavirus-prisons-jails.html; Ctrs for Disease Control and Prevention, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities* (July 22, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html.

Here, exposing Mr. Toure to the unique risks posed by COVID-19 (as well as unnecessarily burdening the prison system with another inmate during these challenging times), while disrupting

his career and his ability to provide for his family as they too navigate this pandemic from Senegal, would be an unnecessary sentence in light of the goals of sentencing.[6]

\*       \*       \*

Mr. Toure is a hardworking family man, with four young children that look forward to speaking with him every day at 7:30 a.m. He played a particularly small part in a much more sprawling scheme that, at worst, served to provide him with a few thousand dollars, which he immediately took to his family in Senegal. He then withdrew from the scheme entirely and took responsibility for his behavior before anyone else involved in this scheme did. He unquestionably made a mistake in judgment, but not one that ought to remove him—and his critically important income—from the lives of his family and expose him to a prolonged risk of a deadly virus, particularly when he has remained a productive and reliable employee every day since he was arrested in this case.

Respectfully submitted,

/s/ *Benjamin D. White*
Benjamin D. White
Sean Hecker

*Attorneys for Sekhou Toure*

cc: Counsel of Record (by CM/ECF)

---

[6] Pursuant to the Plea Agreement, Mr. Toure agreed to forfeit $56,079.48 representing proceeds traceable to the offense to which he pled guilty. *See* 18 U.S.C. § 982(a)(2)(A). Mr. Toure also agreed to make a restitution payment of the same amount pursuant to 18 U.S.C. § 3663 (which, as the PSR notes, "is to be paid jointly and severally with the co-defendants in this case," PSR ¶ 109). The Plea Agreement also noted that after determining Mr. Toure's ability to pay, the Court may impose a fine of $4,000 to $1,000,000 pursuant to U.S.S.G. § 5E1.2. As the PSR suggested, however, Mr. Toure will not be in a position to pay a fine on top of forfeiture and restitution in this case. *See* PSR ¶ 97 & p. 22; *see also U.S. v. Rattoballi*, 452 F.3d 127, 139 (2d Cir. 2006), *abrogated in part on other grounds by Kimbrough v. U.S.*, 552 U.S. 85 (2007) (whether to impose a fine is discretionary after *Booker*, 543 U.S. at 245, so long as the district court considers the § 3553(a) factors and standards outlined in 18 U.S.C. §§ 3571 and 3572); *see also* U.S.S.G. § 5E1.2, cmt. 3 (noting that "determination of the fine guideline range may be dispensed with entirely upon a court determination of present and future inability to pay any fine" and the fact that an indigent defendant is represented by assigned counsel is a "significant indicator[] of present inability to pay any fine").